Good morning, Your Honors. My name is David Avery, and I represent Ms. Tavia Hamilton. Although Ms. Hamilton raises four challenges in her appeal, I think this is a fairly easy case for several reasons. First of all, one of the issues, and that would be her eligibility for the safety valve, is completely subsumed by another issue, and that would be the question of whether she should have gotten an enhancement for her managerial role. The case is also easy because the relevant case law with respect to the other three issues, the managerial enhancement, the acceptance of responsibility, and the drug amount, as those issues play out in this case, it's clear case law. There's not conflict with respect to the sub-issues. For instance, it's agreed that the main issue with respect to the managerial enhancement is, is there actual evidence of control? It's not a matter of who's more culpable than the other with respect to drug amount. Likewise, with respect to the acceptance of responsibility issue, the case law is clear that her guilty plea and her other demonstrations of acceptance are very significant evidence of acceptance that cannot be undercut by such insignificant incidents like the drinking incidents that occurred close to her change of plea time. That one I don't quite follow, because under Cooper and Cesarolini, or however one pronounces it, seems to me pretty clear in the circuit that post-arrest conduct of this sort, post-sentencing conduct of this sort, post-conviction conduct of this sort count. Your Honor, I think the actual distinction, the relevant time distinction is post-change of plea. Now, there were a couple of instances here that were right around the change of plea, and they both involved alcohol intoxication. And there was the issue of whether or not she pulled over too slowly when there was a traffic incident. But when you put those next to all of the demonstrations of her acceptance, which include the fact that she pled guilty much earlier than most anybody else in this conspiracy, the fact that she allowed herself to be debriefed numerous times, that she testified against her sister, those are much more significant demonstrations of acceptance than the relatively minor incidences that she had near her change of plea. And the government has conceded that Ms. Hamilton is an extreme or was an extreme addict at the time, and as we've briefed, people in her circumstances most of the time have difficulty just quitting using drugs and quitting using alcohol that quickly. And so it's not odd that she had that ongoing problem after the change of plea. But what's most important is the other stuff that was going on in her life. And I think that the government said at sentencing this was sincere demonstrations of acceptance. She admitted she had a problem. And so I think the critical time is after the – before the change of plea. I also think this is an easy case because at sentencing, not only is the case law clear, but at sentencing at least the parties were in agreement, in complete agreement about the facts, too, and how they are affected by the case law. The more difficult question for me and for Ms. Hamilton is the complete reversal that the government's taken on appeal. And if I could draw the Court's attention to excerpts of record, pages 91 through 95, those – only those five pages alone include factual and legal admissions by the government that completely undermine the government's position with respect to all of the issues now that they're on appeal. Why does the government feel it's an obligation to file an Anders brief on behalf of the Court? It did occur to me what, you know, what should the government do in this situation and maybe not respond at all because, I mean, they've taken positions at sentencing and there's no – there are no new facts. And so for the government to say at sentencing that there is no evidence in my investigative file that I could present that Ms. Hamilton exercised control, that she determined when sales were going to take place, that she exercised any kind of organizational authority, and then, without any new facts, in its response to say that the Court was within its discretion to find the managerial enhancement, first of all, I think that's the wrong standard of review. The Court's never got discretion to find something that's not factually based. But my main point is that everybody agreed at the time of sentencing that she hadn't exercised managerial control. She had accepted responsibility. She was an extreme addict using a lot of methamphetamine, which meant that the 408 grams that were tallied in the PSR could not all be attributed to drugs that she was going to sell or intended to sell. And Ms. Hamilton is not trying to score some esoteric points relating to judicial estoppel. Her concern is that this Court see that at sentencing things were so clear to the government that it took the positions that it took there. And the government is not in the business of conceding smaller drug amounts. It's suggested the government probably felt an obligation to file an Anders brief. That may give you a hint as to what I think. You might want to save some time to hear the government try to defend it and see if they're going to, because they may not. Okay. That's good advice, counsel. Thank you, Your Honors. I'll do that, then. I'll save the rest of my time. Well, that puts me in an enviable position. At least you had to grin a little bit. That's true. May it please the Court, my name is Marcia Hurd, and I'm an assistant U.S. attorney for the District of Montana. And I was actually the attorney who was at President's sentencing in the case below and entered into the plea agreement. In this case, I think there has become a serious misunderstanding about why we're here. This isn't about the government's position that we took at sentencing or the government's position on the brief, but it's really about what authority does the Court have. And a plea agreement does not imprison the independent obligation of the Court to decide what they believe the facts are. It was interesting to sit and listen to the first oral argument today, because there was some significant discussion about that. Although in that argument, the Court was much more active in actually examining witnesses and somewhat putting the government on the spot to put witnesses on the stand. But this isn't about what position we took below and what position we take on appeal. This is about did the Court have the authority to do what it did. Ginsburg. To hone in on a couple of things that I think are just extraordinarily problematic, the first is the manager-supervisor thing. And even if you accept the PSR statement, it strikes me as being extremely conclusory. And while it refers to some information that might indicate that she in fact did direct some people and whatever, none just leaps out. It doesn't mean that the district court on remand couldn't possibly do the same thing on an augmented record, but I just don't see it on this one. And then the second thing to me is the drug quantity that was attributed to her. This is a conviction, if I've got it right, for possession with intent to distribute. That's correct. She can only get hit for drugs that she had possession of for purposes of distribution, not for personal use. And the PSR is uncompredicted that she used enough to more than account for the quantity that was at her house, even if you put aside the fact that she shared the house with another big user. So could you just, you know, sort of take those two things at least and tell us how it's defensible? Okay. The first that I'd like to talk about is the drug amount. And I think the Kipp case is very clear that you're supposed to exclude in possession with intent to distribute cases amounts that are intended solely for personal use. In this case, it is uncontroverted that there are two heavy methamphetamine users who live in this residence. And the court looked at the total amount of drugs that was found just during the search, which ended up being attributable to about 388 grams. That was the large rock that was found in a pan under the bed, three bags that were about 80-some grams, plus the $7,458 in cash, and attributed at $100 a gram, ended up 388 grams. Plus the court looked at amounts that she had admitted distributing to Deanna LeMay, who was a co-conspirator and also her sister. So that was the amount that the judge used in terms of setting forth what basic drug amount, which was different than the amount that had been agreed to in the plea agreement. He didn't make a specific Kipp finding, but he was also looking at not just what was found during the search and what she admitted distributing to Deanna LeMay or what Deanna admitted she had distributed to her, but also the whole scope of relevant conduct under this period of conspiracy. Because even though she pled guilty to possession with intent to distribute, there was evidence of the conspiracy that came in under relevant conduct. And I think in reviewing the record, that's why the judge didn't make a specific Kipp finding about drug amounts, was because this conduct had been going on for at least two years from 2000 to 2002 when she was a resident. And that's the answer to the question as to whether the what they found was for personal use or for sale. Correct. And my argument is, first, as to the cash, $7,458, especially on an Indian reservation, is a large amount of money, and I don't think anybody would dispute that that was evidence from the distribution. That was money she had gotten because of that. I think the 4,000 that she won at the lottery. Well, there was some discussion about that. It didn't end up being a hotly disputed fact. And I guess the reason was because the Court didn't say as to this amount found in the house at that time, I make a decision, half was for personal use and half was for sale, because I think he felt the overall conspiracy and the relevant conduct amounts were so big that it wouldn't have mattered. And so he picked on that as being a hands-on, if you would say it, amount. If the Court were to do a KIPP finding, would he also have to exclude any amounts that would have been used by her common-law husband? I don't believe so because it was clear on this record that Taffy Hamilton was the director, was the head, if we want to say that. If there were amounts there that she intended to share with her common-law husband, that would still fall within the amount that she would be distributing? Absolutely, because she's distributing to another person. Even if she's not selling it to him. Exactly. Because the distribution under Ninth Circuit law is very clear that it can be for any gain or no gain in exchange for a thing of value or not. Is your position that there was a KIPP finding here or not? No. My position is there was. But you said there wasn't. There wasn't a KIPP finding there. And I think the judge felt. Well, what's your interpretation of KIPP in terms of whether that's a mandatory requirement? I don't think that KIPP says it's mandatory. If you have a discrete amount, I would argue that it would be. If you have a person that you have no other evidence about, there is no relevant conduct, and he's caught with a gram, you need to decide, did he possess that with intent to distribute or was that personal use? But when you have this case, which is a conspiracy over a number of years with large amounts of methamphetamine, I don't think that KIPP requires a specific finding, because there's so much relevant conduct that could have gotten her way over the 500 grams to a mandatory minimum of 10. Notwithstanding the argument here that this person was an exceptionally high user? I think that's correct, Your Honor, because when Deanna LeMay was questioned at the time of all of these people's arrests, she admitted to large amounts of purchasing from Ms. Hamilton, and Ms. Hamilton confirmed that. But I guess I think in trying to delve into what was in the judge's mind, that's probably what he was thinking and why no specific KIPP finding was made. The acceptance of responsibility issue is also reviewed for clear error, and I think that's one where nobody disagrees on what the facts were. And the court was within its discretion on those facts to make that decision. Yes, this woman debriefed, and yes, she took responsibility for selling drugs, and yes, she cooperated, and even since that time has testified in addition. But I think the court was concerned about the fact that she comes in, she enters a plea of not guilty, is released on conditions, uses drugs, comes back in to talk about that, is released, and then after she pleads guilty, has several more run-ins with the law, including drinking, which is a violation of her conditions of release and failing to pull over when law enforcement wanted her to. So I think that one, the facts are the facts, and you review that for clear error, and the judge thought that she hadn't accepted responsibility. The manager-supervisor is obviously the more problematic issue in terms of the finding that the court made. The plea agreement indicated that the United States and the defendant believed that the enhancement was not warranted. The court found that it was warranted, and again said, I don't like your plea agreement, I don't agree with your plea agreement, and specifically had the government stand up and say, I'm not bound by your plea agreement, is that correct? And I answered yes, this is not a binding plea agreement. So was Mr. Berge ever examined? He was not called as a witness in that case. I believe that both – there was a related case, as noted in the excerpts of record. Ms. LeMay actually went to trial, and there was testimony in her case about Ms. Hamilton and about Mr. Berge. Mr. Berge ended up pleading guilty, and there was no trial. But there were no witnesses called in the sentencing hearing. So we're not in the same position as the first argument, where the court then had some testimonial evidence upon which to base its conclusions. The court relied very heavily on the pre-sentence report and the findings within the pre-sentence report, and we are to look at that then on appeal for clear error. And the question would be, were the findings the fact that he made supported by a preponderance of the evidence? The interesting part about the managerial discussion and decision, I think, was in the pre-sentence report, you find a very large, especially for that area of the country, lump of methamphetamine in a pan under the bed, three other large baggies of methamphetamine, almost $7,500 in cash, and a police scanner, a number of scales, and interestingly enough, a surveillance camera that has been set up to capture people coming and going from what is a very, very rural area. And so I think the judge was looking at all of those things, including statements made by Mr. Berge, some of which the government absolutely concedes were unreliable. Mr. Berge wanted to be a confidential informant and then stole the transmitter and the money that he was given for the buys. And so there were some things that was clear that Mr. Berge had puffed about in terms of drug amounts, but it's also clear that he was arrested with almost $1,500, 15 grams worth of methamphetamine on him that everybody admits he just purchased from Taffy Hamilton. So I think there were some facts within the pre-sentence report that weren't disputed that the Court could have relied upon and did in making that determination Thank you, counsel. Your time has expired. Mr. Avery, you have some reserved time. Thank you, Your Honor. Maybe this case is not quite as easy as you thought. We'll see. Your Honor, I think if you go through each of these sentencing rulings, that there is a problem in that they're all based on conclusory statements taken from the PSR. And I'll just go through each of them. The managerial enhancement, the PSR says that Taffy Hamilton exercised control over five others and that she made decisions about where drugs were going to be sold, when the transactions were going to take place, where they were going to take place. But if you look within the PSR, that is belied by the fact that her sister, Deanna LeMay, in paragraph, I think it's 17, is calling her up whenever she wants drugs and saying, come over here. Come to my house. Drive to my house. I need some drugs. With respect to the amount, if I can get off track for just a second, the government said that Deanna LeMay made statements that she bought large amounts from Ms. Hamilton. The PSR says it attributes 19 grams to being sold to Ms. LeMay. And out of 408, that's not that large of an amount. So I'm not exactly sure where these huge amounts are that the court didn't make any finding about outside the 408 grams. If there was some kind of mechanism going on in the court's mind about drugs outside the 408 grams, it's just not on the record, and I don't think this court has any way to determine whether it was something that was a mechanism that is useful or was helpful in actually determining the amount of drugs. I think the government, if I hear them right, is saying, well, the district court basically figured 408 was somewhere there in the right amount and just threw up its hands and didn't want to make a kit finding. But under Rule 32, once we and the government, for that matter, disputed some of the 408 grams as personal use meth, then it's the district court's job to either find that that doesn't make a difference, it won't affect my ruling, or to make a ruling on whether or not that was personal use methamphetamine or not. And if you look at page 97 of the excerpts of record, there was no KIPP analysis whatsoever. The court just went and said, I find all of that is attributable to her, and that's not what Rule 32 contemplates. Regarding the acceptance of responsibility, I would just say that, again, when somebody is as much of an addict as Ms. Hamilton is, and they have one dirty UA after the month after the indictment, but several months before the change of plea, that's really the only conduct that's related to her possession of methamphetamine that the district court based its denial of the acceptance on. Drinking is not the same thing as methamphetamine, and the case law says... But wasn't she under an agreement not to violate other laws? She was, and that... And wasn't part of her agreement not to use alcohol? And as the government pointed out at the sentencing hearing, those kind of issues speak to whether or not she should be out on pretrial release or release pending her case, especially when you're talking about did she have contact with law enforcement and she didn't pull over in time? Yes, she's not allowed to do those while she's out on release, and she got put into jail because she violated those terms. But those kind of issues that aren't related to methamphetamine possession don't speak to whether she's accepted responsibility for that offense. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will take its morning recess. All rise. This Court stands in recess.
judges: O'scannlain, Rymer, Bybee